**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **WILLCAR HOLDINGS LLC**<br><br>***Plaintiff*,**<br>**v.**<br><br>**CHANNELL COMMERCIAL CORPORATION, CHRISTOPHER WATSON, AND BRIAN DILASCIA**<br><br>***Defendants*.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. ____________<br><br>**TRIAL BY JURY DEMANDED** |

**PLAINTIFF WILLCAR HOLDINGS LLC'S COMPLAINT FOR COST <u>RECOVERY, DECLARATORY AND INJUNCTIVE RELIEF, AND DAMAGES</u>**

Plaintiff Willcar Holdings LLC ("Willcar" or "Landlord") brings this action against Defendants Channell Commercial Corporation ("Channell Commercial" or "Tenant"), Christopher Watson ("Watson"), and Brian DiLascia ("DiLascia") (collectively, "Defendants"), and, by and through its undersigned attorneys, alleges upon knowledge as to its own acts and upon information and belief as to the acts of all others, as follows:

## <u>NEED FOR ACTION</u>

1. This case is about Tenant's negligent release of thousands of gallons of an ignitable hazardous polyester resin ("Resin") containing styrene (the "Release")[1] at a purpose-built industrial facility owned by Landlord located at 1700 Justin Road in Rockwall, Texas (the "Property"). Rather than fully investigating and remediating the Release in accordance with its legal and contractual obligations to Landlord, Channell Commercial spent months minimizing its

[1] Throughout this Complaint, the May 3, 2026 release incident described herein is referred to interchangeably as the "Release," the "Spill," and/or the "Disposal."

significance, resisting additional investigation, and delaying remedial work. The result is an ongoing environmental condition that Channell Commercial caused but failed to timely address.

2. Channell Commercial initially claimed that only a "small amount" of Resin had reached the storm drain and that there was "no indication" that Resin had traveled through the system to the nearby detention pond.

3. In reality, the data tells a different story. By the time Channell Commercial discovered the Release roughly ten hours later, thousands of pounds of hazardous Resin had escaped containment, crossed the loading area, entered the underground storm drain system, and traveled hundreds of feet beneath Willcar's Property toward an outfall that discharges into a public detention pond. Recent soil testing at the affected storm drain detected styrene at roughly eight times the applicable Texas risk-based level.[2]

4. Indeed, Channell Commercial's own limited investigation found the Resin "cured in place" approximately 268 feet inside Willcar's underground storm drain line, well before the end of the drainage pathway. Channell Commercial halted the investigation before the downstream route had been fully examined. Rather than expand the investigation, Channell Commercial opposed further testing and challenged the necessity of the very work that ultimately revealed contamination exceeding applicable regulatory levels. Channell Commercial's position was not simply wrong. It delayed the investigation of contamination that had already traveled beyond the release area and into Willcar's stormwater infrastructure.

5. When Willcar pressed to investigate further, Channell Commercial resisted, mischaracterizing Willcar's proposed testing as "unnecessary, duplicative, incurred in bad faith."

[2] Styrene (CAS No. 100-42-5) is a volatile organic compound and is designated as a "hazardous substance" under Section 102(a) of CERCLA, 42 U.S.C. § 9602, 40 C.F.R. § 302.4(a).

Willcar ultimately was forced to seek judicial intervention to obtain the broader investigation and source-area work Channell Commercial refused to perform. The results proved why Willcar's proposed work was necessary. Testing performed after that intervention produced the latest result: hazardous styrene present in soil beside the storm drain at roughly eight times the actionable Texas risk-based level.

6. The consequences of Channell Commercial's Release go beyond triggering a costly cleanup. The Release also impaired the marketability and value of an industrial asset in which Willcar invested tens of millions of dollars. Willcar cannot meaningfully market, sell, or finance the Property while the extent of the Release remains unresolved. Any purchaser or lender must confront what remains, what further remediation may be required, and what obligations may follow the Property. Even a successful cleanup cannot erase the history of a documented Release of hazardous substances and unpermitted Disposal of hazardous waste. Willcar therefore seeks recovery for both the diminution in value caused by the unresolved environmental condition today and any residual diminution that remains after reasonable restoration.

7. Tenant's conduct breached the terms of the Lease between Willcar and Channell Commercial (defined below) and gives rise to liability under federal environmental law and Texas state tort law. The conduct of Christopher Watson and Brian DiLascia likewise gives rise to individual liability under federal environmental law. As alleged below, each personally exercised operational authority over matters bearing on Channell Commercial's manufacturing operations, environmental compliance, and the prevention and control of releases:

- **CERCLA:** Congress enacted the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675, to promote the prompt cleanup of releases of hazardous substances and place qualifying response costs on the parties responsible for the contamination. Channell Commercial's manufacturing operation released styrene-containing Resin into Willcar's Property, forcing Willcar to incur substantial costs investigating and responding to the Release. Because Defendants

Christopher Watson and Brian DiLascia personally exercised control over operations specifically related to pollution, they are individually liable for Willcar's recoverable response costs.

- **RCRA:** The federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6992k, protects against dangers arising from the management, handling, and disposal of solid and hazardous waste and authorizes judicial relief where those conditions may present an imminent and substantial endangerment to health or the environment. That relief is necessary here because damages alone cannot locate the remaining hazardous waste, determine the full extent of the environmental condition, or eliminate the danger it may present. Willcar therefore seeks an order requiring Channell Commercial to complete the investigation and address the waste condition created by its manufacturing operations, rather than leave Willcar and the surrounding environment exposed to an incompletely investigated Release.

- **Breach of Contract and Indemnity:** The parties did not leave responsibility for a Release like this to chance. The Lease specifically addresses hazardous materials arising from Channell Commercial's use and occupancy, requires Channell Commercial to maintain and promptly repair the Property, and obligates Channell Commercial to fund the cleanup costs resulting from hazardous material discharges during its tenancy. The Lease separately requires Channell Commercial to indemnify Willcar for losses, damages, and professional costs arising from Channell Commercial's environmental obligations. The parties thus allocated this risk before the Spill occurred. Willcar seeks to enforce that bargain and require Channell Commercial to bear the responsibility it expressly accepted.

- **Negligence:** Channell Commercial's responsibility does not depend solely on the Lease. Independent of its contractual obligations, Channell Commercial has a duty to exercise reasonable care in operating its manufacturing equipment and handling hazardous materials so as not to damage Willcar's Property. Channell Commercial breached that duty when styrene-containing Resin escaped its manufacturing equipment, migrated through Willcar's Property and entered its underground drainage infrastructure.

8. Taken together, this case presents a straightforward allocation of all responsibility for the environmental contamination at the Property to Tenant. Channell Commercial controls the operations, manages the storage tank, and owns and handles the Resin. Willcar does not. Channell Commercial caused the Release. Willcar did not. Yet Tenant abdicated its duties and attempted to shift the burden of its own Release to Willcar, forcing Landlord to protect its Property and the surrounding environment, determine where the hazardous substances and waste migrated, and bear

the financial consequences, all while the full extent of the condition remains unknown. Leaving those consequences with Willcar would reward Channell Commercial for delaying, resisting, and underinvestigating the very contamination its operations caused. It would turn responsibility upside down and defy common sense, the Lease, and federal environmental law. Willcar brings this action to recover the substantial costs that Channell Commercial's negligent actions have forced Willcar to incur and the resulting diminution in the Property's value.

## PARTIES

9. Plaintiff Willcar Holdings LLC is a Delaware limited liability company that owns the Property. Willcar is the landlord under a commercial lease agreement for the Property dated January 1, 2017, as amended by a First Amendment to Lease dated November 1, 2023, a Second Amendment to Lease dated February 7, 2025, and a Third Amendment to Lease dated June 10, 2025 (collectively, the "Lease").

10. Defendant Channell Commercial Corporation is a Delaware corporation that operates a manufacturing facility at the Property as a tenant under the Lease. On information and belief, Channell Commercial is a wholly owned subsidiary of Prysmian Cables and Systems USA, LLC, a Delaware limited liability company.

11. Defendant Christopher Watson is an individual who served as Channell Commercial's President at the time of the Release. In that role, Watson was responsible for Channell Commercial's day-to-day business and operations, including its manufacturing facilities and operations at the Property.

12. Defendant Brian DiLascia is an individual and Senior Vice President of Digital Solutions for Prysmian North America.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including CERCLA, 42 U.S.C. §§ 9601–9675, and RCRA, 42 U.S.C. §§ 6901–6992k.

14. This Court has exclusive original jurisdiction over Willcar's CERCLA claims under Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), which vests the United States district courts with exclusive original jurisdiction over all controversies arising under CERCLA.

15. This Court has jurisdiction over Willcar's RCRA claims under Section 7002(a) of RCRA, 42 U.S.C. § 6972(a).

16. This Court has supplemental jurisdiction over Willcar's state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to Willcar's federal claims that they form part of the same case or controversy.

17. This Court has personal jurisdiction over each Defendant. Defendant Channell Commercial operates the manufacturing facility at the Property, and Willcar's claims against Channell Commercial arise from its operations and conduct at the Property. Defendant Christopher Watson personally directed and participated in operations and response activities at the Property, including matters concerning the Release, and Willcar's claims against Watson arise from that Texas conduct. Defendant Brian DiLascia personally participated in communications and decisions concerning environmental conditions, cleanup, and other matters at the Property, and Willcar's claims against DiLascia arise from that Texas conduct.

18. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Willcar's claims occurred at the Property, which is located in Rockwall County, Texas, within the Dallas Division of the Northern District of Texas.

Venue is also proper under Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the Release and resulting damages occurred in this District, and under Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), because the alleged violations occurred and the alleged endangerment may occur in this District.

19. On August 14, 2026, Willcar personally served Defendant Channell Commercial with notice of its intent to bring this action under 42 U.S.C. §§ 6972(a)(1)(A) and (a)(1)(B), as required by 42 U.S.C. §§ 6972(b)(1)(A) and (b)(2)(A) and 40 C.F.R. Part 254. Defendant Channell Commercial was served at the Property, and service was accepted by Kara Baldera. A copy of the notice and affidavit of delivery is attached as Exhibit A.

20. On that same date, Willcar also sent a copy of such notice, via registered mail, return receipt requested, to the Attorney General of the United States, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region 6, the Executive Director of the Texas Commission on Environmental Quality ("TCEQ"), Channell Commercial's registered agent in Texas, and Prysmian as Channell Commercial's parent entity, as required by 42 U.S.C. §§ 6972(b)(1)(A) and (b)(2)(A) and 40 C.F.R. Part 254.

21. As set forth below, Willcar's RCRA claims involve violations of subchapter III of RCRA, 42 U.S.C. §§ 6921–6939g. Accordingly, under the express exceptions in 42 U.S.C. §§ 6972(b)(1)(A) and (b)(2)(A), Willcar may bring those claims immediately after notification without waiting the otherwise applicable 60-day or 90-day periods.

## <u>FACTUAL BACKGROUND</u>

### I. The May 3, 2026 Release and Environmental Crisis at the Property

22. On May 3, 2026, Channell Commercial's storage system failed, releasing an estimated 2,615 pounds of Reichhold Polylite 31720-00, a polyester Resin containing at least 980

pounds of styrene (CAS No. 100-42-5),[3] a CERCLA-designated hazardous substance, into the environment over approximately ten hours. The Resin is also classified as "ignitable" hazardous waste (EPA Hazardous Waste No. D001) under RCRA.

23. Channell Commercial did not discover the Release when it occurred. Channell Commercial's personnel first discovered the Release at approximately 4:45 a.m. on May 4, 2026—approximately ten hours after the system failure. During that time, the Resin flowed unabated from Channell Commercial's containment area, across the loading dock, into a storm catch basin, into on-site soils and groundwater, and through an underground storm pipe, ultimately discharging to an off-site stormwater detention basin. Given its hazardous nature, the Resin's own Safety Data Sheet ("SDS") expressly warned handlers to prevent the product from entering drains and storm sewers—precisely the pathway Channell Commercial allowed the Resin to take.

24. Channell Commercial's response to the Release was neither timely nor sufficient. Channell Commercial failed to discover the Release for approximately ten hours, failed to timely report it to TCEQ, proposed delaying critical source-removal activities for six months, and failed to conduct the investigation necessary to determine the full extent of contamination caused by the Release.

25. While Channell Commercial informed Willcar that it conducted initial environmental sampling in response to the Release, those results were never provided to Willcar. In fact, while Watson referenced the sampling results in written correspondence, Willcar later learned that Channell Commercial had lost the results.

26. Given Channell Commercial's inadequate response efforts and failure to comply with its obligations under the Lease, Willcar retained its own environmental consultant and has

[3] The Resin contains 37.5% styrene by weight.

incurred significant response costs to conduct a comprehensive investigation to identify the impacts of the Release and the efforts needed to address it.

27. Willcar's investigation revealed regulatory exceedances confirming the severity of the contamination. Soil and surface water samples taken between June and August 2026 revealed exceedances of hazardous substances above TCEQ Tier 1 Action Levels. Because of these exceedances, the Property is now subject to Texas Risk Reduction Program ("TRRP") requirements, yet the horizontal and vertical extent of contamination in soil, groundwater, and surface water has not yet been fully delineated.

28. The Release is ongoing, the contamination is migrating, and the threat to health and the environment is imminent and substantial. Each day that passes without comprehensive remediation allows hazardous substances and hazardous waste to spread further into soil, groundwater, and downstream waters.

29. What began as a failure in Channell Commercial's manufacturing equipment carried Resin containing hazardous substances and hazardous waste out of Channell Commercial's operations, into the environment, and through Willcar's physical improvements.

## II. Willcar Develops a State-of-the-Art Headquarters and Manufacturing Facility for Channell Commercial

30. Willcar purchased and developed the Property in approximately 2017 as Channell Commercial Corporation's headquarters and manufacturing facility.

31. Channell Commercial became Willcar's first and has remained its only tenant at the Property.

32. The Property is not a generic warehouse. Willcar developed it as a modern, high-quality industrial facility capable of supporting sophisticated manufacturing operations. Willcar

invested substantial resources in the project, selected high-quality materials, and retained leading contractors and subcontractors to construct a state-of-the-art manufacturing facility.

33. Channell Commercial was already a long-established manufacturer when it moved its headquarters to the Property. The Channell family had built and operated the company for more than a century. Channell Commercial manufactured its own products, as well as the tooling, dies, and molds used to make them. The Property housed the equipment, systems, storage and loading areas, and other specialized infrastructure required for those operations.

34. Channell Commercial took possession when the Property had just been developed by Willcar. No prior tenant occupied the Property, operated manufacturing equipment there, or handled the products, materials, or equipment used in Channell Commercial operations. The environmental condition caused by the Release was not present when Channell Commercial took possession. Channell Commercial's exclusive occupancy forecloses any suggestion that the damage caused by the Release originated with a predecessor tenant or some earlier industrial operation.

35. During this period, William "Bill" Channell Jr. was involved with both Willcar and Channell Commercial. His family had built and operated the Channell Commercial business, and Bill Channell selected the Property, developed the manufacturing facility, and ran Channell Commercial's business there. The two companies nevertheless performed distinct roles. Willcar owned the land and building. Channell Commercial leased the Property and operated the manufacturing business conducted there.

36. Channell Commercial—not Willcar—ran the manufacturing operations at the Property. Channell Commercial employed the workforce, operated and maintained the manufacturing equipment and industrial systems, handled the products and materials used in

production, managed hazardous wastes generated by the operations, and controlled its manufacturing processes. Willcar did not operate or maintain Channell Commercial's production equipment or systems, handle its products or wastes, or direct its manufacturing operations.

37. The Property's manufacturing equipment, Resin storage and transfer systems, outdoor containment areas, and drainage infrastructure are integral to the waste-generating and waste-management activities.

38. Channell Commercial conducted those waste-generating activities through equipment and systems it operated at the Property, including the resin-storage and transfer system located in the outdoor containment area adjacent to the loading dock. The catch basins, storm drain pipe, and box culvert serving the Property are part of the infrastructure through which hazardous substances and hazardous waste could migrate if released from Channell Commercial's operations.

39. The Lease assigned Channell Commercial responsibility for environmental matters arising from its operations. Section 4.01 requires Channell Commercial, as Tenant, "throughout the Lease Term, at its own expense and risk," to "maintain the Premises and all improvements on them in the same condition as on the Commencement Date reasonable wear and tear excepted," including by "making all repairs and replacements necessary to continuously keep the Premises and improvements in such condition." Section 4.01 further requires that "[a]ll maintenance, repairs, and replacements required by this Section must be performed promptly by Tenant when required by the then-existing circumstances, without any notice from Landlord." Section 4.03 separately addresses environmental cleanup costs and provides:

> [Tenant] is responsible only for the payment of that portion of any cleanup costs necessary for compliance with Hazardous Materials Laws that arise as a result of Tenant's use or occupancy of the Premises . . . including, without limitation, the discharge of Hazardous Materials on, under or about the Premises during the Tenant's occupancy of the Premises.

40. Throughout Channell Commercial's occupancy, Willcar has owned the Property and improvements thereon. Channell Commercial has remained the Property's first and only tenant and has controlled the manufacturing operations conducted there at all times relevant hereto.

### III. Milan, Italy-Based Prysmian Acquires Channell Commercial and Christopher Watson and Brian DiLascia Assume Operational Control and Authority

41. On June 10, 2025, Prysmian, a global cable and systems company headquartered in Milan, Italy, completed its acquisition of Channell Commercial Corporation. The acquisition transferred ownership of Channell Commercial to Prysmian but did not include the Property, which remained owned by Willcar. Channell Commercial remained in possession of the Property and continued operating its manufacturing business there as Tenant under the Lease.

42. Bill Channell initially remained with Channell Commercial as Chief Executive Officer after the acquisition. But his title outlasted his operational role. By January 2026, Bill Channell had ceased all involvement in Channell Commercial's operations. He did not run Channell Commercial's day-to-day business or the Property, supervise Tenant's manufacturing operations or employees, oversee its equipment or maintenance decisions, or make operational decisions concerning the Property.

43. Watson became Channell Commercial's President in May 2023 and had responsibility for its day-to-day business and operations, including its manufacturing facilities. His responsibilities included management of operations at the Property, including the procedures governing production equipment, material handling, hazardous waste generation, environmental compliance, and release prevention.

44. Based on Watson's assigned responsibilities and Channell Commercial's management structure, Willcar alleges, upon information and belief, that Watson had authority over significant operational matters at the Property, including procedures governing production

equipment, maintenance practices, material handling, waste generation, regulatory compliance, and measures designed to prevent, control, and contain releases from Channell Commercial's manufacturing operations.

45. Willcar further alleges, upon information and belief that, when significant manufacturing issues required executive action, Watson had authority to direct changes to operating procedures and corrective measures concerning Channell Commercial's manufacturing equipment and operations. At the Property, that authority extended to significant operational matters concerning the Resin system and the procedures governing the storage, transfer, handling, and containment of products, hazardous materials, and solid and hazardous waste.

46. Watson did not act in isolation. Upon information and belief, he reported to and was subject to the direction of Brian DiLascia, a senior executive of Prysmian, Tenant's owner. By the time of the Release, DiLascia exercised authority over operational, health, safety, and environmental matters concerning Channell Commercial's manufacturing facilities, including the Property and matters implicated by the Release. Upon information and belief, that authority included oversight of operational decisions and procedures bearing on material handling, containment, environmental compliance, and the prevention and control of releases from Channell Commercial's manufacturing operations.

47. DiLascia's own communications confirm his personal involvement in those operational and environmental matters. Addressing conditions at the Property, DiLascia referred to Prysmian "taking the keys in Jan" and stated that "we have more to go." He addressed environmental conditions directly: "we want to resolve any environmental issues, whatever they are." He further stated that "[w]e are brin[g]ing in all types of people to help improve the health, safety, and environmental standards to our Prysmian standards," acknowledged that doing so

would require "quite a culture change for the team there," and assured Willcar that "we will spend the money and time needed."

48. DiLascia's involvement also reached Channell Commercial's manufacturing operations themselves. In the same communication, he described an ongoing evaluation of constructing another facility to "relocate manufacturing" and stated that he had "fully updated Massimo over the weekend," referring to Prysmian's Chief Executive Officer. Those communications, together with his supervisory relationship with Watson, place DiLascia personally in the chain of authority over Channell Commercial's manufacturing and environmental operations, including matters concerning the Property and the Release.

49. The details of Channell Commercial's internal reporting structure, the matters reported or elevated to Watson, and the directions he gave or decisions he made are principally within Defendants' knowledge and possession. Willcar alleges those internal matters upon information and belief based on Watson's assigned responsibilities and Channell Commercial's management structure. As described below, Watson's own documented conduct after the Release was consistent with those responsibilities. His May 13, 2026 communication addressed water testing, concrete coring, contamination in the underground storm drain, the distance the Resin had traveled, work near the detention pond, and agency communications.

50. By May 3, 2026, Willcar still owned the Property but did not operate the manufacturing facility. Channell Commercial did. Watson was Channell Commercial's President and continued to hold the operational responsibilities alleged above, including responsibility for Channell Commercial's manufacturing facilities and the procedures governing manufacturing activities at the Property, such as compliance with environmental laws. Despite those responsibilities, Watson failed to ensure that Channell Commercial timely determined the extent

of the Release, promptly addressed the hazardous substances and hazardous waste that had migrated through the Property, or implemented response measures sufficient to prevent continuing environmental harm.

**IV. Willcar Undertakes Its Own Investigation to Protect the Property**

51. After the Release was discovered ten hours after the system failed, Channell Commercial retained an outside vendor to perform limited and insufficient response work in the area of the Release and within portions of the storm drain system. More than a month after the Release, significant environmental work remained.

52. On June 5, 2026, more than one month after the Spill, Channell Commercial submitted a report to TCEQ which acknowledged that "additional remediation is required, which Tenant acknowledges and is undertaking." In the report, Channell Commercial contemplated additional sampling, removal of concrete along the path the Resin took to the catch basin, evaluation of the soil beneath that area, and further work within the storm drain system depending on what the investigation revealed. Channell Commercial proposed to leave critical source-removal and investigation activities incomplete until November 2026, effectively allowing contamination to remain in place for approximately six months after the Release. Channell Commercial thus knew its Release had reached surface water, yet still proposed a timeline that would leave critical source-area and storm drain work unresolved for months.

53. Channell Commercial's own testing confirmed that the effects of the Release extended downstream. Sampling detected styrene at the box-culvert outfall on the south side of Justin Road on May 14, 2026 and again on May 21, 2026. In its report to TCEQ, Channell Commercial acknowledged what those results showed: "Sample data indicates styrene entered surface water."

54. Watson personally participated in Channell Commercial's response to the Release. On May 13, 2026, after speaking with Willcar's principal and conferring with Channell Commercial personnel, Watson provided a written update concerning the environmental work. He addressed water sampling in the area of the Release and at the detention pond and stated that he had recommended additional concrete core sampling around the loading area. As to what had been removed from the underground storm drain and how far contamination had traveled through it, Watson stated that he was "looking to understand those details." He further reported that no third party had yet performed work at the detention pond and that, as of that morning, Channell Commercial had not communicated with TCEQ concerning the Spill.

55. Watson's update confirmed that significant questions remained regarding the extent of the contamination, the distance the Resin had traveled through the storm drain system, and the scope of the work required to address the Release. Channell Commercial still did not know how far the contamination had migrated, had not completed critical investigation and source-removal activities, and was proposing to leave contamination unresolved for months. Willcar could not allow Tenant's delay to dictate the pace of environmental response while hazardous substances and hazardous waste potentially continued migrating through Willcar's Property and into the environment. Willcar therefore retained Approach Environmental, LLC ("Approach") to investigate the Release, assess its effects on the Property, and advise Willcar concerning necessary response measures.

56. From June 6 through June 8, 2026, Approach, by and through its subcontractors, performed electrical resistivity tomography ("ERT") surveys in the area of the Release, near the storm drain inlet, and along the storm drain to the south. A total of 17 resistivity surveys were

performed on top of the storm drain and in the drainage ditch south of Justin Road. Six of the 17 resistivity surveys showed anomalies consistent with possible contamination along the storm drain.

57. From June 22 through June 24, 2026, Approach conducted soil borings and installed monitoring wells in the area between the location of the Release and the storm drain inlet at the Property. Laboratory analysis of the soil samples collected beneath the concrete between the Release area and the storm drain grate revealed detections of benzene, toluene, ethylbenzene, total xylenes (collectively, "BTEX"), and styrene. These contaminants were consistently detected in samples from zero to two feet below ground surface, confirming that contamination from the Resin had penetrated the subsurface along the Release pathway.

58. Groundwater analytical data from temporary monitoring well TMW-9, located just northeast of the storm drain grate, revealed an ethylbenzene concentration of 2.95 mg/L—exceeding the TCEQ Action Level of 0.7 mg/L by more than four times.

59. Approach also collected surface water samples from three locations within the detention pond adjacent to the Property on the south side of Justin Road. Laboratory analysis of the surface water sample Water A, collected near the storm drain outlet, showed a styrene concentration of 0.198 mg/L—nearly double the TCEQ Action Level of 0.1 mg/L. Surface water sample Water B, collected at the midpoint of the detention pond, also showed detections of ethylbenzene (0.123 mg/L) and styrene (0.0794 mg/L). These results confirm that contaminants from the Release had migrated through the storm drain system, discharged into the detention pond, and dispersed into the receiving surface water body, precisely the migration pathway that the Resin's own SDS warned against.

60. A dispute later developed over the scope of the work Willcar could undertake at the Property. Willcar invoked its rights under the Lease to self-perform work that it contended

Channell Commercial had not timely completed and notified Channell Commercial that Approach would conduct environmental inspections and sampling. Channell Commercial disputed Willcar's right to perform portions of that work itself. On June 5, 2026, Channell Commercial declared Willcar's self-performance notice "defective and void" and warned that an attempt by Willcar to perform the work would "constitute a breach of the Lease." Channell Commercial's counsel later declared the notice "null, void, and/or rejected" and warned that interference with Channell Commercial's remediation plan would be treated as a "material breach of the Lease." Channell Commercial thus attempted to block Willcar from performing the investigation and response work that Channell Commercial itself had failed to complete. At the same time, Channell Commercial acknowledged that Willcar could continue conducting environmental inspections and sampling at its own cost.

61. Willcar then sought judicial relief concerning the Release and its rights at the Property. On June 29, 2026, Willcar filed an action in the 382nd Judicial District Court of Rockwall County, Texas, and obtained a temporary restraining order addressing the preservation of evidence relating to the Release. The parties thereafter negotiated an agreement governing the environmental work at the Property.

62. Under that agreement, made pursuant to Texas Rule of Civil Procedure 11, Channell Commercial agreed, at its initial cost, to remove a 15-foot-by-15-foot section of concrete centered on the catch basin in front of the loading dock and to excavate the soil beneath that area to a depth of three feet below the slab. Both parties could collect confirmatory split samples from the excavation before Channell Commercial backfilled the area and replaced the concrete. Channell Commercial also agreed that Willcar could retain Approach, at Willcar's initial cost, to

conduct borings and install monitoring wells at various locations on the Property. The parties expressly reserved who ultimately would bear those costs. Their Rule 11 agreement provides:

> [N]othing in this Rule 11 Agreement resolves or affects responsibility for the ultimate costs and/or any indemnification of any testing, investigation, remediation, removal, replacement, repair, or related work.

63. The agreement further provides that those cost and indemnification issues will be determined under the Lease and applicable law and expressly preserves the parties' respective rights, claims, defenses, and remedies.

64. After reaching that agreement, Willcar nonsuited the state-court action without prejudice. Willcar's investigation and other response activities relating to the Release continued.

65. Most recently, from August 1 through August 4, 2026, Approach conducted additional investigation activities at the Property, including the installation of monitoring wells along the areas of anomalies in the storm pipe shown in the June 2026 ERT survey and soil sampling in the excavated area around the storm grate.

66. The soil samples in the excavated area revealed alarming results. Ethylbenzene was detected at 19.7 mg/Kg, more than twice the 7.6 mg/Kg TCEQ Action Level. Styrene was detected at a concentration of 26.2 mg/Kg, almost eight times the TCEQ Action Level of 3.3 mg/Kg.

67. Willcar has incurred substantial costs for environmental consultants, investigation, sampling, testing, drilling, laboratory analysis, contractors, and other response activities arising from the Release. Willcar incurred those costs to investigate, monitor, assess, and evaluate the Release, determine its nature and extent, and identify and undertake additional response measures necessary to protect the Property. Those costs continue to accrue. Channell Commercial has reimbursed none of them. Instead of paying for the investigation and response work its Release made necessary, on June 22, 2026, Channell Commercial stated that "whatever 'costs' or expenses

Landlord has incurred following the recent spill were unnecessary, duplicative, incurred in bad faith, and/or not subject to reimbursement by Tenant."

68. Willcar's investigation remains ongoing. Additional sampling and evaluation are underway, and the full extent of the Release's effects on the Property and adjacent properties, including the detention pond, has not yet been determined. Willcar continues to investigate and respond to the Release through qualified environmental professionals. The scope of the additional investigation and response measures required, the cost of that work, and the extent of any resulting diminution in the Property's value remain to be determined.

69. As that investigation continued, Willcar required continued access to the Property to inspect the work performed and ascertain the condition of the Property. On August 12, 2026, Willcar provided Channell Commercial written notice pursuant to Section M of the Lease that Willcar and its representatives would access the Property for that purpose on August 14, 2026. In response to an inquiry from Channell Commercial's counsel, Willcar further explained that Bill Channell and potentially another Willcar representative intended to inspect the work performed at the Property to date.

70. On August 14, 2026, Bill Channell arrived at the Property on Willcar's behalf. During the visit, security personnel closely monitored Bill Channell, remained in close proximity to him, and restricted his ability to move freely around Willcar's Property. Bill Channell perceived Channell Commercial's conduct as harassing and intimidating. The security personnel appeared in uniform with visible holstered sidearms, handcuffs, radios, and substantial duty and tactical gear. Security personnel also told Bill Channell, in substance, that neither he nor Willcar owned the Property nor had a right to access it. Taken together, their appearance and conduct appeared

calculated to intimidate Bill Channell and provoke a confrontation over Willcar's exercise of its access rights.

71. During the visit, security personnel acknowledged they were present to monitor Willcar and report back information to Prysmian. In fact, security personnel were in direct communication with Jefferson Harwell, Prysmian's Senior Corporate Counsel, concerning Willcar's activities on the Property.

72. In response to Channell Commercial's hostile behavior towards Willcar, Bill Channell contacted the Rockwall Police Department. The security personnel continued their aggressive posturing until responding officers arrived at the Property. Their conduct de-escalated only after the police arrived.

73. The August 14 incident further reflects Channell Commercial's past and ongoing interference with Willcar's contractual right to enter, inspect, and ascertain the condition of its Property in response to Channell Commercial's Release. The conduct was particularly troubling given that Willcar owns the Property and had provided advance notice of its inspection. Rather than facilitate inspection of conditions caused by its own Release, Channell Commercial deployed security personnel in a manner that restricted Willcar's movement, challenged Willcar's ownership and access rights, and discouraged Willcar from exercising rights expressly granted by the Lease.

## V. Tenant's Spill Imposes an Environmental Stigma on a Unique and Valuable Property

74. The costs of investigation and response do not capture the full harm to Willcar. The Property is a modern, high-quality industrial asset that Willcar developed as Channell Commercial's headquarters and manufacturing facility. It now carries a documented history of a styrene-containing Release that escaped Channell Commercial's manufacturing equipment,

traveled through the Property's drainage infrastructure, reached the downstream outfall, and required substantial environmental investigation and response.

75. That history has created an environmental stigma that affects the Property today. A prospective purchaser or lender evaluating the Property would have to account for the documented Release, the environmental investigation and response work, the scope of additional work that remains to be determined, and the potential for additional regulatory or remedial requirements as that work proceeds. Those conditions affect the terms on which the Property can be marketed, financed, or sold and have diminished its present marketability and fair market value.

76. Completion of the investigation and response work may not restore the Property to its pre-Release value. The Property will retain a documented history of the Release and the environmental investigation and response it required. To the extent that history continues to reduce what a willing buyer would pay after the response work is complete, Willcar will suffer a residual diminution in fair market value. For a modern, high-quality industrial asset of this character, even a relatively small diminution in value could represent a substantial loss. The amount and duration of any such diminution will be established through the evidence.

## CAUSES OF ACTION

### COUNT 1
### CERCLA Cost Recovery Against Defendant Channell Commercial
### *42 U.S.C. § 9607(a)*

77. Willcar incorporates by reference all preceding allegations as though fully set forth herein.

78. This claim arises under Section 107(a) of CERCLA, 42 U.S.C. §§ 9607(a)(1), (a)(2), (a)(4)(B).

79. Channell Commercial is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

80. The Property is a "facility" as defined by CERCLA § 101(9), 42 U.S.C. § 9601(9).

81. Styrene is a designated "hazardous substance" under CERCLA § 102(a), 42 U.S.C. § 9602, 40 C.F.R. § 302.4(a), and thus falls within the definition of "hazardous substances" under CERCLA § 101(14), 42 U.S.C. § 9601(14)(B).

82. Channell Commercial managed, directed, and conducted operations at the Property during a time period when styrene was released into the environment at the Property, and is therefore a "covered person" liable under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2).

83. CERCLA defines "release" to include "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22). The spilling, leaking, and escaping of at least 980 pounds of styrene from the Property constitutes a "release" of a hazardous substance into the environment within the meaning of CERCLA § 101(22).

84. The continued, unremoved presence of residual styrene inside the storm drain pipe and at the structural defect, together with the potential for further migration through the damaged pipe into surrounding soil, groundwater, and surface waters, constitutes a "threatened release" of a hazardous substance.

85. Channell Commercial is therefore liable under CERCLA § 107(a), 42 U.S.C. § 9607(a).

86. As a result of the Release, Willcar has incurred and will incur "response" costs within the meaning of CERCLA §§ 101(23)-(25), 42 U.S.C. §§ 9601(23)-(25).

87. All such costs are necessary costs of response and, to the extent required, consistent with the National Contingency Plan ("NCP"). *See, e.g.*, 40 C.F.R. § 300.410.

88. Willcar is entitled to full reimbursement from Channell Commercial for all such response costs, pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

89. Willcar did not pollute the Property or otherwise cause the Release.

90. Accordingly, Channell Commercial is jointly and severally liable for Willcar's response costs under CERCLA § 107(a), 42 U.S.C. § 9607(a).

**COUNT 2**
**CERCLA Cost Recovery Against Defendant Christopher Watson**
***42 U.S.C. § 9607(a)(2)***

91. Willcar incorporates by reference all preceding allegations as though fully set forth herein.

92. Christopher Watson served as Channell Commercial's President at the time of the Release. His responsibilities included direct management and oversight of Channell Commercial's manufacturing operations and facilities, including the procedures governing Channell Commercial's activities at the Property and in associated operational areas.

93. Watson's operational responsibilities extended to manufacturing activities at the Property, including the storage, transfer, handling, and use of polyester resin through equipment and systems at the Property, including the outdoor storage tanks adjacent to the loading dock.

94. Upon information and belief, Watson actively directed, participated in, and exercised control over significant operational and environmental matters at the Property, including procedures concerning production equipment, maintenance, safety, material handling, and measures to prevent, control, and contain releases.

95. Watson's authority extended to directing changes to operating procedures and requiring corrective measures concerning manufacturing equipment, processes, and operations at the Property, including the Resin system. Operational, safety, maintenance, environmental, and regulatory issues at the Property were elevated to him for management and decision-making. This included, without limitation, compliance with environmental and safety regulations, emergency response actions, and engagement with regulatory agencies.

96. Watson personally exercised that authority before the May 3, 2026 Release. In 2025, Channell Commercial experienced an overflow involving Resin containing styrene from one of the outdoor storage tanks in the same group later involved in the Release. The 2025 incident involved the same type of Resin and the same Resin-storage and handling operations at issue here.

97. Following the 2025 incident, Watson was personally presented with a recommendation that an employee involved in those operations be removed from those duties. Watson, exercising his authority over the personnel, decided not to change the personnel involved with Channell Commercial's Resin and styrene operations. Instead, Watson personally revised or approved revisions to the procedures governing the storage, handling, and use of Resin at the Property.

98. Those revised procedures governed Channell Commercial's Resin operations after the 2025 incident and remained in place when the Release occurred. Watson thus personally exercised authority before the Release over both the personnel conducting Channell Commercial's Resin operations and the procedures governing the storage and handling of the same type of Resin involved in the later Release.

99. Watson personally participated in and directed the actions taken in responding to the Release, including actions concerning environmental testing, contamination in the

underground storm drain system, concrete sampling, the extent of Resin migration, work at or near the detention pond, and communications with governmental agencies.

100. Watson knew that contamination from the Release had entered the underground storm drain system and that Channell Commercial had not determined how far it extended. Watson also personally addressed Channell Commercial's communications with TCEQ concerning the Release.

101. Watson's personal involvement in the 2025 overflow demonstrates that, before the Release, his operational authority extended directly to the personnel and procedures governing Channell Commercial's Resin-storage and handling operations at the Property, including practices concerning Resin containment and the prevention and control of releases. His documented conduct following the Release was consistent with and further confirmed that preexisting operational and environmental authority.

102. On May 3, 2026, while Watson was exercising that authority, Channell Commercial's Resin system released polyester Resin containing styrene at and from the Property. Resin escaped the containment area, entered the Property's underground storm drain system, and traveled hundreds of feet downstream toward the outfall and detention pond.

103. Styrene is a designated "hazardous substance" under CERCLA § 102(a), 42 U.S.C. § 9602, 40 C.F.R. § 302.4(a), and thus falls within the definition of "hazardous substances" under CERCLA § 101(14), 42 U.S.C. § 9601(14)(B).

104. The Release of styrene constituted a "release" of hazardous substances within the meaning of 42 U.S.C. § 9601(22).

105. The Property is a "facility" as defined by CERCLA § 101(9), 42 U.S.C. § 9601(9).

106. Watson is individually liable as an "operator" under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2).

107. As a result of the Release, Willcar has incurred and will incur "response" costs within the meaning of CERCLA §§ 101(23)-(25), 42 U.S.C. §§ 9601(23)-(25).

108. All such costs are necessary costs of response and, to the extent required, consistent with the NCP. *See, e.g.*, 40 C.F.R. § 300.410.

109. Willcar is entitled to full reimbursement from Watson for all such response costs, pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

110. Willcar did not pollute the Property or otherwise cause the Release.

111. Accordingly, Watson is jointly and severally liable for Willcar's response costs under CERCLA § 107(a), 42 U.S.C. § 9607(a).

## COUNT 3
## CERCLA Cost Recovery Against Defendant Brian DiLascia
***42 U.S.C. § 9607(a)(2)***

112. Willcar incorporates by reference all preceding allegations as though fully set forth herein.

113. Brian DiLascia is a senior executive of Prysmian. He is employed by Prysmian, not Channell Commercial, and acted in his Prysmian capacity in the conduct alleged below.

114. Willcar does not seek to hold DiLascia liable because of his position at Prysmian, Prysmian's ownership of Channell Commercial, his relationship with Watson, or any theory of derivative corporate liability. This Count arises from DiLascia's own conduct and from the operational and environmental authority he personally exercised at and concerning Channell Commercial's manufacturing facilities, including the Property.

115. Prysmian completed its acquisition of Channell Commercial in June 2025 and incorporated Channell Commercial into its Digital Solutions business. Following the acquisition, Prysmian began integrating Channell Commercial's personnel and manufacturing operations into Prysmian's organization and operating standards.

116. Before the Release, Prysmian publicly announced that DiLascia would "assume responsibility for Digital Solutions and the integration of Channell." Prysmian described DiLascia as a longtime company executive whose prior leadership roles included engineering and operations.

117. By May 3, 2026, DiLascia was exercising that role and authority over significant operational matters involving Channell Commercial's manufacturing facilities, including the Property.

118. Watson reported to DiLascia and was subject to his direction on significant operational matters involving Channell Commercial's manufacturing facilities, including matters concerning the Property. DiLascia had authority to direct Watson and other Channell Commercial personnel concerning operational matters falling within his assigned responsibilities.

119. DiLascia's authority reached Channell Commercial's manufacturing facilities themselves, including the Property. His responsibilities included the operations conducted at those facilities and the implementation there of Prysmian's health, safety, and environmental standards.

120. Within that sphere of authority, significant operational, safety, and environmental matters involving Channell Commercial's manufacturing facilities were presented to DiLascia for decision or direction. DiLascia had authority to determine how those matters would be addressed, to direct Watson and other personnel concerning them, and to commit the personnel and resources necessary to implement Prysmian's health, safety, and environmental standards.

121. At the Property, DiLascia's operational authority reached manufacturing practices and procedures bearing directly on environmental compliance, material handling and containment, equipment maintenance and safety, and the prevention, control, and containment of releases from Channell Commercial's manufacturing operations.

122. The precise scope and exercise of DiLascia's authority at the Property—including the matters presented to him before May 3, 2026, his communications with Watson as Watson's direct supervisor, and his decisions concerning those matters—are principally within the possession and control of DiLascia, Prysmian, and Channell Commercial. Willcar pleads those internal matters upon information and belief on the basis of Prysmian's announcement concerning DiLascia's role, Willcar's information concerning his supervisory authority over Watson, Willcar's direct communications with DiLascia and Watson concerning the Property and operations, and DiLascia's own written statements describing his involvement in Channell Commercial's manufacturing, health, safety, and environmental matters.

123. DiLascia's own written statements provide concrete evidence of the nature and scope of his role. In a written communication to Willcar's principal concerning Channell Commercial's facilities and environmental conditions, DiLascia described Prysmian as having "tak[en] the keys in Jan" and as already engaged in addressing conditions at Channell Commercial, stating that "we have more to go."

124. DiLascia addressed Channell Commercial's environmental matters directly and as matters for Prysmian to resolve: "we want to resolve any environmental issues, whatever they are."

125. DiLascia personally described and embraced Prysmian's efforts to change the health, safety, and environmental practices at Channell Commercial. Speaking of those efforts in the first person, he stated that "we are brin[g]ing in all types of people to help improve the health,

safety, and environmental standards to our Prysmian standards," acknowledged that doing so would require "quite a culture change for the team there," and assured Willcar that "we will spend the money and time needed."

126. DiLascia's involvement also extended to significant decisions concerning Channell Commercial's facilities and manufacturing operations. In the same communication, he described an ongoing evaluation of constructing a new facility to "relocate manufacturing" if Prysmian chose that course. His communication thus reflects his personal involvement in decisions concerning the location and operation of Channell Commercial's manufacturing activities.

127. DiLascia also personally reported matters concerning Channell Commercial to Prysmian's highest management. In the same communication, he stated that he had "fully updated Massimo over the weekend," referring to Prysmian's Chief Executive Officer.

128. DiLascia's own statements show his personal involvement in matters concerning Channell Commercial's manufacturing facilities and operations, including the personnel and resources devoted to those operations and the health, safety, and environmental standards governing them. His involvement thus reached matters affecting the operation of Channell Commercial's facilities themselves, not merely oversight of Tenant as a corporate investment.

129. DiLascia's authority over significant operational matters involving Channell Commercial, his supervisory relationship with Watson, and his documented involvement in Channell Commercial's manufacturing and environmental matters support the reasonable inference that, before and at the time of the Release, DiLascia's operational authority at the Property extended to manufacturing practices and procedures bearing directly on environmental compliance and the prevention, control, and containment of releases from Channell Commercial's manufacturing operations.

130. On May 3, 2026, while DiLascia was exercising that authority, Channell Commercial's Resin-storage system released thousands of pounds of Resin containing styrene. The Resin escaped containment, entered the Property's underground storm drain system, and traveled hundreds of feet through it toward the outfall and detention pond.

131. Styrene is a designated "hazardous substance" under CERCLA § 102(a), 42 U.S.C. § 9602, 40 C.F.R. § 302.4(a), and thus falls within the definition of "hazardous substances" under CERCLA § 101(14), 42 U.S.C. § 9601(14)(B).

132. The Release of styrene constituted a "release" of hazardous substances within the meaning of 42 U.S.C. § 9601(22).

133. The Property is a "facility" within the meaning of 42 U.S.C. § 9601(9).

134. DiLascia is individually liable as an "operator" under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2).

135. As a result of the Release, Willcar has incurred and will incur "response" costs within the meaning of CERCLA §§ 101(23)-(25), 42 U.S.C. §§ 9601(23)-(25).

136. All such costs are necessary costs of response and, to the extent required, consistent with the NCP. *See, e.g.*, 40 C.F.R. § 300.410.

137. Willcar is entitled to full reimbursement from DiLascia for all such response costs, pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

138. Willcar did not pollute the Property or otherwise cause the Release.

139. Accordingly, DiLascia is jointly and severally liable for Willcar's response costs under CERCLA § 107(a), 42 U.S.C. § 9607(a).

## COUNT 4
**CERCLA Declaratory Judgment Against All Defendants**
***42 U.S.C. § 9613(g)(2); 28 U.S.C. §§ 2201–2202***

140. Willcar incorporates by reference all preceding allegations as though fully set forth herein.

141. This claim arises under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

142. An actual, substantial, and continuing controversy exists between Willcar and all three Defendants concerning Defendants' liability for the necessary costs of response that Willcar has incurred and will continue to incur in connection with the Release. As alleged in Counts 1-3, Willcar contends that Defendants are liable under 42 U.S.C. § 9607(a) for all such costs; upon information and belief, Defendants dispute that contention.

143. Because the full nature and extent of the contamination remain under investigation and Willcar's response actions are ongoing, Willcar will continue to incur necessary costs of response to address the Release after the filing of this Complaint.

144. Accordingly, Willcar is entitled to a declaratory judgment that Defendants are liable for all past and future necessary costs of response that Willcar has incurred and will incur consistent with the NCP as a result of the Release and threatened release of hazardous substances at and from the Property. CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2).

145. A declaratory judgment will avoid a multiplicity of future suits as Willcar's investigation and response continue, and will provide certainty regarding Defendants' liability for necessary response costs that Willcar has not yet incurred.

## COUNT 5
**RCRA Imminent and Substantial Endangerment Claim Against Defendant Channell Commercial**
***42 U.S.C. § 6972(a)(1)(B)***

146. Willcar incorporates by reference all preceding allegations as though fully set forth herein.

147. This claim arises under the citizen suit provision of RCRA, 42 U.S.C. § 6972(a)(1)(B), which authorizes any person to commence a civil action against any person, including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

148. Willcar is a "person" who may bring a citizen suit pursuant to RCRA, 42 U.S.C. § 6972, 42 U.S.C. § 6903(15).

149. Channell Commercial is a large quantity generator ("LQG") of hazardous waste under 40 C.F.R. Part 262 and operates the Property.

150. Channell Commercial is therefore a "person" subject to the citizen suit provisions of RCRA, 42 U.S.C. § 6972(a)(1)(B), as a past or present generator of hazardous waste. 42 U.S.C. § 6903(15).

151. The Resin released at the Property on May 3, 2026 constitutes "solid waste" as defined in 42 U.S.C. § 6903(27), 40 C.F.R. § 261.2.

152. The Resin is a "hazardous waste" under RCRA because it is "ignitable" (EPA Hazardous Waste No. D001) with a flash point of 89°F, as stated in the Resin's SDS (Sections 9 and 13), and poses a substantial present or potential hazard to human health or the environment

when improperly treated, stored, transported, disposed of, or otherwise managed. 40 C.F.R. § 261.3; 42 U.S.C. § 6903(5).

153. The Release therefore constituted a "disposal" of "hazardous waste" under 42 U.S.C. § 6903(3).

154. Channell Commercial's failures in response to the Disposal constitute ongoing and continuing conduct, not a wholly past act. The Resin, which is a hazardous waste, continues to be present in the storm drain system, to migrate into the environment, and to leach into groundwater. Channell Commercial is therefore "contributing to" the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste within the meaning of 42 U.S.C. § 6972(a)(1)(B).

155. Channell Commercial contributed and is contributing to the disposal of hazardous waste by: (a) operating the Resin-storage system whose failure caused the Disposal; (b) failing to contain the Disposal and allowing hazardous waste to escape into the environment; (c) failing to remove the hazardous waste from the storm drain system, catch basin, and box culvert; (d) affirmatively deferring source removal until November 3, 2026, thereby allowing hazardous waste to remain in and on the Property and to continue leaching into the environment despite known evidence that styrene had entered surface water and remained in the storm drain system; and (e) failing to properly characterize, treat, store, or dispose of the recovered waste, contaminated soil, surface water, and other material that resulted from the Disposal.

156. The hazardous waste in and emanating from the storm drain system, the catch basin, and the surrounding soil, groundwater, and surface waters may present an imminent and substantial endangerment to health or the environment, including a continuing threat to the Property, surrounding properties, and downstream water resources.

157. Willcar further alleges that Channell Commercial is plausibly violating subchapter III of RCRA (42 U.S.C. §§ 6921–6939g), as set forth as an independent cause of action in Count 6 below.

158. Because this action "respect[s] a violation of subtitle C" of RCRA, the 90-day notice waiting period prescribed by 42 U.S.C. § 6972(b)(2)(A) is excused, and Willcar may bring this action immediately after serving the required notice. *See* 42 U.S.C. § 6972(b)(2)(A); *Glazer v. American Ecology Envtl. Servs. Corp.*, 894 F. Supp. 1029, 1039–41 (E.D. Tex. 1995).

159. Willcar personally served the notice required by 42 U.S.C. § 6972(b)(2)(A) on Channell Commercial on August 14, 2026 and has satisfied all jurisdictional prerequisites to this action.

160. On information and belief, neither the Administrator of the EPA nor the State of Texas has commenced or is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with the permits, standards, regulations, conditions, requirements, prohibitions, or orders at issue in this Count, or to restrain or abate the acts or conditions giving rise to the endangerment alleged herein, within the meaning of 42 U.S.C. § 6972(b)(2)(B)–(C). This action is therefore not barred by RCRA's diligent prosecution provisions.

161. Willcar is entitled to a mandatory injunction ordering Channell Commercial to: (a) perform a complete hazardous waste determination for all material remaining in the storm drain system, catch basin, and box culvert; (b) remove and properly dispose of all hazardous waste from those locations; (c) repair the structural defect in the storm drain pipe; and (d) conduct a comprehensive groundwater investigation and, to the extent contamination exceeds applicable TCEQ Tier 1 Action Levels, remediate the affected groundwater.

162. Willcar is further entitled to a prohibitory injunction restraining Channell Commercial from: (a) causing or permitting any further disposal of hazardous waste from the Property into the storm drain system or the environment; and (b) continuing to defer source removal and remediation in a manner that allows hazardous waste to remain in unpermitted locations and contamination to continue migrating into groundwater.

163. Willcar is entitled to recover its costs of litigation, including reasonable attorney and expert witness fees, under 42 U.S.C. § 6972(e).

**COUNT 6**
**Violation of RCRA Permit, Standard, Regulation, or Requirement Against Defendant Channell Commercial**
***42 U.S.C. § 6972(a)(1)(A)***

164. Willcar incorporates by reference all preceding allegations as though fully set forth herein.

165. This claim arises under RCRA, 42 U.S.C. § 6972(a)(1)(A), which authorizes any person to commence a civil action against any person alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to RCRA.

166. Willcar is a "person" who may bring a citizen suit pursuant to RCRA, 42 U.S.C. § 6972. 42 U.S.C. § 6903(15).

167. Channell Commercial is a "person" within the meaning of 42 U.S.C. § 6903(15), is subject to the citizen suit provisions of RCRA, 42 U.S.C. § 6972, and is an LQG subject to the hazardous waste management requirements of subchapter III of RCRA, 42 U.S.C. §§ 6921–6939g, and their implementing regulations at 40 C.F.R. Parts 260–279.

168. Channell Commercial is in violation of 42 U.S.C. § 6925 and 40 C.F.R. Part 270 by operating the catch basin, storm drain pipe, and box culvert at the Property as an unpermitted

disposal facility for hazardous waste. The catch basin, storm drain pipe, and box culvert are functioning as unpermitted disposal units for D001 hazardous waste. Channell Commercial holds no RCRA Part 270 permit authorizing the disposal of hazardous waste in these locations, yet the waste has remained there continuously for nearly three months without removal.

169. Channell Commercial, as an LQG subject to 40 C.F.R. Part 262, is required to determine whether each solid waste it generates or manages is a hazardous waste. Channell Commercial has never made a hazardous waste determination for the waste still lodged in the storm drain pipe. This is a violation of 40 C.F.R. § 262.11.

170. Channell Commercial was required, after stopping operations in response to the Disposal, to "monitor for leaks, pressure buildup, gas generation, or ruptures in valves, pipes, or other equipment, wherever this is appropriate." 40 C.F.R. § 262.265(f). Channell Commercial has failed to comply with this continuing obligation, which did not terminate upon cessation of the initial Disposal.

171. Channell Commercial is in violation of 40 C.F.R. § 262.265(g) for failing to treat, store, or dispose of recovered waste and contaminated material following the Disposal. Immediately after an emergency, an LQG's emergency coordinator "must provide for treating, storing, or disposing of recovered waste, contaminated soil or surface water, or any other material that results from a release, fire, or explosion at the facility." 40 C.F.R. § 262.265(g). Unless the LQG demonstrates, in accordance with 40 C.F.R. § 261.3(c) or (d), that the recovered material is not a hazardous waste, "it is a newly generated hazardous waste that must be managed in accordance with all the applicable requirements and conditions for exemption in parts 262, 263, and 265." *Id*. Channell Commercial failed to properly treat, store, and dispose of the hazardous waste following the Disposal.

172. Channell Commercial is in violation of 40 C.F.R. § 262.265(h) for resuming operations at the Property before the cleanup was completed. A LQG's emergency coordinator must ensure that, in the affected area, "[n]o hazardous waste that may be incompatible with the released material is treated, stored, or disposed of until cleanup procedures are completed," and that "[a]ll emergency equipment listed in the contingency plan is cleaned and fit for its intended use before operations are resumed." 40 C.F.R. § 262.265(h). Channell Commercial resumed operations prior to completion of cleanup of the hazardous waste.

173. These violations have become effective pursuant to RCRA within the meaning of 42 U.S.C. § 6972(a)(1)(A) and are ongoing, continuing violations, not wholly past acts. The unpermitted disposal of hazardous waste in the storm drain system, catch basin, and box culvert persists as of the date of this Complaint. The failure to make the required hazardous waste determination for the material in the storm drain system persists as of the date of this Complaint. The Subpart M emergency procedure violations—including the failures to monitor, to properly treat, store, or dispose of recovered waste and contaminated material, and the resumption of operations before cleanup procedures were completed—are ongoing and have not been cured.

174. Because these are violations of subtitle C of RCRA, 42 U.S.C. § 6921 et seq., this action "respect[s] a violation of subtitle C" within the meaning of 42 U.S.C. § 6972(b)(1)(A), and the 60-day notice waiting period otherwise applicable to claims under 42 U.S.C. § 6972(a)(1)(A) is excused. Willcar may bring, and is bringing, this claim immediately after serving the required notice. *See* 42 U.S.C. § 6972(b)(1)(A); *Glazer,* 894 F. Supp. at 1039–41.

175. Willcar served Channell Commercial with the notice required by 42 U.S.C. § 6972(b)(1)(A) on August 14, 2026, as alleged above, and has satisfied all jurisdictional prerequisites to this claim.

176. On information and belief, neither the Administrator of the EPA nor the State of Texas has commenced or is diligently prosecuting a civil or criminal action in a court of the United States or a State to require Channell Commercial's compliance with the permits, standards, regulations, conditions, requirements, prohibitions, or orders at issue in this Count, within the meaning of 42 U.S.C. § 6972(b)(1)(B). This cause of action is therefore not barred by RCRA's diligent prosecution provisions.

177. Willcar is entitled to an order requiring Channell Commercial to comply with 42 U.S.C. § 6925 and 40 C.F.R. Part 270, 42 U.S.C. § 6922 and 40 C.F.R. § 262.11, and 40 C.F.R. § 262.265(f)–(h), including by making a complete hazardous waste determination for, and properly removing and disposing of, all hazardous waste remaining in the storm drain system, catch basin, and box culvert, and by resuming appropriate emergency monitoring and cleanup procedures.

178. Willcar is entitled to a declaratory judgment that Channell Commercial's conduct, as alleged above, violates 42 U.S.C. §§ 6922 and 6925 and their implementing regulations, including 40 C.F.R. §§ 262.11 and 262.265(f)–(h).

179. Willcar is entitled to recover its costs of litigation, including reasonable attorney and expert witness fees, under 42 U.S.C. § 6972(e).

## COUNT 7
## Breach of Contract/Lease Against Defendant Channell Commercial

180. Willcar incorporates by reference all preceding allegations as though fully set forth herein.

181. Willcar and Channell Commercial are parties to a valid and enforceable Lease governing the Property. Willcar has performed its obligations under the Lease, and all conditions precedent to Willcar's claims have occurred or been performed.

182. The Lease expressly addresses chemical spills and the environmental risks created by Channell Commercial's operations:

- § 3.02 requires Tenant, at its sole cost, to comply with Hazardous Materials Laws in connection with its use of the Premises;
- § 4.03 assigns Tenant responsibility for cleanup costs necessary for compliance with Hazardous Materials Laws arising from Tenant's use or occupancy, including discharges of Hazardous Materials during Tenant's occupancy; and
- § 9.04 requires Tenant to indemnify Willcar for losses, damages, and costs arising from Tenant's action or inaction concerning its obligations under Articles C and D, including counsel, engineering, and other professional or expert fees.

183. Channell Commercial itself has taken the position that §§ 3.02, 3.03, 4.03, and 9.04 "demonstrate that the parties reasonably anticipate the potential spill of chemicals or other hazardous materials."

184. The Lease also places responsibility for maintaining and repairing the Property on Channell Commercial. Willcar developed and constructed the Property before Channell Commercial took possession, and Channell Commercial entered the new facility as its first tenant and has remained its only tenant ever since.

185. Section 4.01 provides that Channell Commercial accepts "the Premises in its AS IS condition as of the Commencement Date." Channell Commercial agreed, "throughout the Lease Term, at its own expense and risk," to "maintain the Premises and all improvements on them in the same condition as on the Commencement Date reasonable wear and tear excepted," including by "making all repairs and replacements necessary to continuously keep the Premises and improvements in such condition." Section 4.01 further requires "[a]ll maintenance, repairs, and

replacements required by this Section" to be performed "promptly . . . when required by the then-existing circumstances, without any notice from Landlord."

186. The First Amendment confirms that obligation by defining Channell Commercial's duty "to maintain and repair (at Tenant's sole cost and expense) the Premises and all improvements thereon" as Tenant's "M&R Obligations."

187. Section M separately grants Willcar the explicit right to enter and inspect its Property. Upon 24 hours' written notice, Landlord or its authorized agent "shall have access to the Premises at reasonable times for reasonable business purposes including, but not limited to, ascertaining the condition of the Premises, conducting environmental inspections and sampling, [and] conducting any maintenance, repairs or replacements."

188. Section 4.03 separately allocates environmental cleanup costs. Channell Commercial "is responsible only for the payment of that portion of any cleanup costs necessary for compliance with Hazardous Materials Laws that arise as a result of Tenant's use or occupancy of the Premises," including costs arising from "the discharge of Hazardous Materials on, under or about the Premises during the Tenant's occupancy of the Premises."

189. The Release falls squarely within those provisions. Styrene-containing polyester Resin escaped Channell Commercial's storage system, crossed the loading dock, entered Willcar's underground storm drain system, and traveled hundreds of feet through the Property.

190. Channell Commercial—not Willcar—operated the storage system, handled the Resin, and controlled the manufacturing operations that used it.

191. Channell Commercial performed initial response work, but it did not complete the work required by the Release and, instead, left material questions unresolved regarding the extent of contamination, the condition of the storm drain system, and the work necessary to restore the

Property. By June 5, 2026, Tenant acknowledged in writing that "additional remediation is required, which Tenant acknowledges and is undertaking." A June 17, 2026 camera inspection then found Resin still "cured in place" approximately 268 feet downstream from the inlet and ended before tracing the full downstream drainage route. The investigation remains ongoing, and the full extent of the environmental condition associated with the Release has not yet been determined.

192. Channell Commercial has not completed the maintenance, repairs, and replacements required by § 4.01 because Resin remains in Willcar's storm drain system and the work necessary to repair and restore the Property remains unfinished.

193. Section 4.01 applies throughout the term of the Lease and is not limited to damage ultimately traced to Channell Commercial. Channell Commercial must maintain the Property and improvements in the condition required by § 4.01, reasonable wear and tear excepted, including by addressing other conditions the ongoing investigation identifies as falling within those obligations.

194. Section 4.03 independently applies because the Release arose from Channell Commercial's use and occupancy of the Property and occurred during Channell Commercial's tenancy. Willcar has incurred and continues to incur substantial testing, sampling, monitoring, and assessment costs to determine the nature and extent of the Release and the cleanup required. Willcar will also likely be forced to incur substantial cleanup costs necessary for compliance with federal and state environmental laws (Hazardous Materials Laws, as defined under the Lease), together with additional repair and restoration costs necessary to return the Property to its pre-Release condition.

195. Because the Release left the condition of Willcar's Property unresolved, Willcar retained environmental, engineering, and other professionals to investigate and delineate the Release and identify the removal, remediation, repair, replacement, and restoration required. Willcar has incurred substantial costs for that work, including amounts already paid, and remains obligated for additional amounts.

196. Willcar also invoked its contractual right to self-perform Channell Commercial's M&R Obligations by written notice on June 1, 2026. Channell Commercial responded by calling the notice "defective and void" and warning that Willcar's undertaking of the work would "constitute a breach of the Lease." Channell Commercial's outside counsel later called Willcar's notice "null, void, and/or rejected" and warned that interference with Channell Commercial's remediation plan would be treated as a "material breach of the Lease." Channell Commercial thereby attempted to prevent Willcar from exercising contractual rights designed to protect the Property when Tenant failed to act promptly.

197. Channell Commercial's interference with Willcar's contractual rights continued. On August 12, 2026, Willcar gave Channell Commercial more than 24 hours' written notice that Willcar and its representatives would access the Property on August 14, 2026, to ascertain the condition of the Property. Channell Commercial's counsel received and responded to that notice, and Willcar further explained that its representatives intended to inspect the work performed at the Property to date.

198. Willcar therefore satisfied the contractual condition for access under Section M. Nevertheless, as alleged above, when Bill Channell arrived at the Property on Willcar's behalf, Channell Commercial caused or permitted security personnel at the Property, acting in coordination with Prysmian's Senior Corporate Counsel, to interfere with Willcar's exercise of its

access rights by restricting Bill Channell's movement about the Property, challenging Willcar's ownership and right of access, and otherwise impeding the inspection.

199. That conduct breached Section M of the Lease and interfered with Willcar's contractual right to ascertain the condition of its Property and inspect the work being performed in response to the Release.

200. As a result of Channell Commercial's breaches of the Lease, Willcar has incurred and will continue to incur reasonable and necessary costs of investigation, testing, monitoring, assessment, cleanup, remediation, repair, replacement, and restoration, together with the professional costs necessary to perform that work. Willcar seeks all damages, fees, costs, and other relief available under the Lease and applicable law.

201. Channell Commercial has reimbursed none of Willcar's costs.

202. Instead, Channell Commercial characterized Willcar's costs as "improperly or unnecessarily" incurred. After Willcar served its formal indemnity demand, Tenant's outside counsel went further, calling Willcar's costs "unnecessary, duplicative, incurred in bad faith, and/or not subject to reimbursement by Tenant."

203. Willcar's response costs capture only part of its total loss because the Release has left a cloud over Willcar's valuable, purpose-built industrial Property. The Property now carries a documented history of a Release involving hazardous substances and waste and the environmental response it required, while the investigation remains ongoing, the full extent of the resulting condition remains unresolved, and substantial work remains to be performed.

204. The Release has already diminished the Property's marketability and fair market value. Until the investigation is complete, the cleanup is finished, and the condition of the Property can be established, Willcar cannot market, sell, or finance the Property on the same terms as a

comparable industrial property free of that uncertainty. Willcar seeks the resulting diminution in an amount to be proven at trial.

205. Physical remediation will not eliminate the economic loss because the Property will retain the documented history of the Release and the environmental response it required. If that history continues to reduce the Property's fair market value after remediation, Willcar also seeks the resulting residual diminution in an amount to be proven at trial.

206. For these losses, Willcar seeks all damages caused by Channell Commercial's breaches, including its reasonable and necessary costs of investigation, testing, monitoring, assessment, cleanup, remediation, repair, replacement, and restoration; diminution in the Property's fair market value, including the residual diminution remaining after remediation; and all other damages recoverable under the Lease and applicable law.

207. Section 15.07 further provides that the Lease's rights and remedies are cumulative and that exercise of one remedy does not preclude another.

208. Channell Commercial's breaches also required Willcar to retain counsel to enforce the Lease. Section 15.08 requires the breaching party to pay "the reasonable attorney's fees and costs incurred to enforce the Lease." Willcar seeks those fees and costs, together with pre- and post-judgment interest and all other relief to which it is entitled.

## COUNT 8
## Indemnity (§ 9.04) Against Defendant Channell Commercial

209. Willcar incorporates by reference all preceding allegations as though fully set forth herein.

210. The Lease separately requires Channell Commercial to indemnify Willcar for losses, damages, and costs incurred by reason of Channell Commercial's action or inaction concerning its obligations under Articles C and D. Section 9.04 provides:

> Tenant must indemnify, defend, and hold harmless Landlord from and against all claims, liabilities, losses, damages, and costs, foreseen or unforeseen, including without limitation counsel, engineering, and other professional or expert fees, that Landlord may incur by reason of Tenant's action or inaction with regard to Tenant's obligations under Articles C and D of this Lease. This Section survives the expiration or earlier termination of this Lease.

211. Articles C and D govern the obligations implicated by the Release, including Tenant's use of Hazardous Materials and compliance with Hazardous Materials Laws, its duty to maintain and repair the Property, and its responsibility for cleanup costs arising from its use and occupancy.

212. The Release arose from Channell Commercial's equipment and operations.

213. Channell Commercial's actions and inactions concerning its obligations under Articles C and D forced Willcar to investigate, remediate, repair, and restore the Property, only after Channell Commercial failed to timely perform the work itself and then disputed Willcar's right to do so, causing Willcar to incur losses, damages, and costs covered by § 9.04.

214. Those covered losses, damages, and costs include testing, sampling, monitoring, and assessment costs; environmental investigation and remediation costs; repair and restoration costs; and counsel, engineering, and other professional and expert fees. Willcar has already incurred substantial covered losses, damages, and costs, including amounts already paid, and continues to incur more as the investigation, cleanup, repair, and restoration proceed.

215. Willcar invoked § 9.04 in its June 1, 2026 notice, advising Channell Commercial that Willcar had already incurred "liabilities, losses, damages, and costs" arising from the Release.

216. Channell Commercial rejected Willcar's demand. On June 5, 2026, Tenant asserted that "no such indemnification obligations have been triggered." Willcar then served a formal demand for indemnification on June 19, 2026. Channell Commercial has paid nothing in response.

217. Channell Commercial breached § 9.04 by failing to indemnify Willcar for the covered losses, damages, and costs Willcar has incurred.

218. Willcar seeks all losses, damages, and costs recoverable under § 9.04, including the counsel, engineering, and other professional and expert fees expressly covered by that provision.

219. Channell Commercial's breaches required Willcar to retain counsel to enforce the Lease. Section 15.08 requires Tenant to pay the reasonable attorneys' fees and costs Willcar incurs to enforce the Lease. Willcar seeks those fees and costs, together with pre- and post-judgment interest and all other relief to which it is entitled.

**COUNT 9**
**Negligence Against Defendant Channell Commercial**

220. Willcar incorporates by reference all preceding allegations as though fully set forth herein.

221. Channell Commercial operated and controlled the manufacturing processes, equipment, and Resin system from which the Release originated. Willcar did not operate or control that equipment, system, or Channell Commercial's manufacturing processes.

222. In conducting its operations, Channell Commercial owed Willcar a duty to exercise ordinary care to prevent the Resin and other materials it handled from escaping and physically damaging Willcar's Property.

223. Channell Commercial breached that duty. Its Resin system failed, thousands of pounds of hazardous Resin escaped containment, and the Release physically damaged Willcar's Property. Resin traveled hundreds of feet through Willcar's underground storm drain line. Channell Commercial's own June 17, 2026 camera inspection found released material "cured in place" approximately 268 feet inside the line. The inspection ended before reaching the end of the drain pipe, and the condition farther downstream remains unresolved.

224. Testing has also detected styrene, a hazardous constituent of the released Resin, and other volatile organic compounds in groundwater along the storm drain pathway. The relationship of those detections to the Release, and the extent of any related subsurface condition, remain under investigation.

225. Channell Commercial's negligence proximately caused the Release and the resulting physical damage to Willcar's Property. As a result, Willcar has incurred and will continue to incur reasonable and necessary costs to determine the nature and extent of that damage, remove released material, repair and restore affected portions of the Property, and retain the professionals necessary to perform that work.

226. The Release and resulting physical condition have impaired the Property's marketability and fair market value, particularly because the full extent of that condition remains unresolved. To the extent the physical damage cannot reasonably be restored, Willcar seeks the resulting diminution in fair market value.

227. Willcar seeks judgment against Channell Commercial for these damages, together with pre- and post-judgment interest and costs of court.

## ATTORNEY'S FEES

228. Willcar has retained counsel to enforce its rights under the Lease and prosecute its claims against Channell Commercial. Section 15.08 of the Lease provides that, when one party breaches the Lease and the other employs an attorney to enforce its rights, the breaching party must pay all of the attorney's fees and costs incurred to enforce the Lease.

229. Willcar is also entitled to recover its reasonable and necessary attorneys' fees from Channell Commercial under Chapter 38 of the Texas Civil Practice and Remedies Code. Willcar's

claims against Channell Commercial include claims on a written contract within the meaning of Texas Civil Practice and Remedies Code § 38.001(b)(8).

230. Willcar will provide Channell Commercial with presentment of its claim in accordance with Texas Civil Practice and Remedies Code § 38.002 and will satisfy the statutory requirements for recovery of attorneys' fees before seeking such an award.

231. Willcar therefore seeks all attorneys' fees and costs incurred in accordance with the Lease, Chapter 38 of the Texas Civil Practice and Remedies Code, and other applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Willcar Holdings LLC respectfully prays that the Court enter judgment in its favor and against Defendants as follows:

- An award against Defendants Channell Commercial, Christopher Watson, and Brian DiLascia of all necessary response costs Willcar has incurred and is entitled to recover under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), together with all recoverable interest;
- A declaratory judgment under 42 U.S.C. § 9613(g)(2) that Defendants are each liable for all past and future necessary response costs Willcar has incurred and will incur consistent with the NCP as a result of the Release and threatened release of hazardous substances at and from the Property;
- An award against Defendant Channell Commercial of compensatory and actual damages on the negligence and breach of contract claims, including the costs of investigation, monitoring, assessment, and response; the cost of repair and restoration of the Property and/or diminution in fair market value; and all consequential damages;

- An award against Defendant Channell Commercial of all losses, damages, costs, fees, and other amounts recoverable under the indemnity provisions of the Lease, including § 9.04;
- A mandatory injunction under RCRA, including 42 U.S.C. § 6972(a)(1)(B), ordering Defendant Channell Commercial to perform a complete hazardous waste characterization, remove and properly dispose of all hazardous waste remaining in the storm drain system and affected areas, repair the structural defect in the storm drain pipe, and conduct a comprehensive groundwater investigation and remediation to applicable TCEQ Action Levels;
- A prohibitory injunction under RCRA restraining Defendant Channell Commercial from causing or permitting further releases of hazardous waste and from continuing to defer source removal and remediation;
- A declaratory judgment that Defendant Channell Commercial's conduct violates 42 U.S.C. §§ 6922, 6925, 6972(a)(1)(A), and 6972(a)(1)(B), and 40 C.F.R. §§ 262.11 and 262.265(f)–(h), among other applicable requirements of RCRA and its implementing regulations, and that the continued presence of hazardous waste in and emanating from the storm drain system constitutes an imminent and substantial endangerment to health or the environment;
- Such civil penalties and other statutory relief as the Court determines appropriate and authorized under RCRA, including 42 U.S.C. §§ 6972(a) and 6928;
- An award of reasonable attorneys' fees, expert witness fees, and costs of litigation under, among other bases, 42 U.S.C. § 6972(e), Chapter 38 of the Texas Civil

Practice and Remedies Code and other applicable Texas law, and § 15.08 of the Lease;

- Pre- and post-judgment interest at the highest rate allowed by law, including all interest recoverable under 42 U.S.C. § 9607(a) and 28 U.S.C. § 1961, as applicable;
- Costs of court; and
- Such other and further relief, at law or in equity, as the Court deems just and proper.

## JURY DEMAND

Willcar demands a trial by jury on all triable issues, including its claims for negligence and breach of contract and any legal, as opposed to equitable, relief available under CERCLA or RCRA.

Dated: August 14, 2026

Respectfully Submitted,

**DLA PIPER LLP (US)**

*/s/ Will Thompson*

Will Thompson
State Bar No. 24094981
Taylor O. Reed
State Bar No. 24101958
1900 N. Pearl Street
Suite 2200
Dallas, Texas 75201
Telephone: (406) 546-5587
will.thompson1@us.dlapiper.com
taylor.reed@us.dlapiper.com

Meaghan Colligan Hembree
(*Pro Hac Vice forthcoming*)
500 Eighth Street NW
Washington, DC 20004
Telephone: (202) 799-4614
Meaghan.Hembree@us.dlapiper.com

Matthew Klepper
(*Pro Hac Vice forthcoming*)
444 West Lake Street
Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-6805
Matthew.Klepper@us.dlapiper.com

*Attorneys for Plaintiff Willcar Holdings, LLC*

**CERTIFICATE OF SERVICE PURSUANT TO 42 U.S.C. § 6972**

In accordance with 42 U.S.C. § 6972(b)(2)(F), I hereby certify that this Complaint will be served via registered mail, return receipt requested, on the Attorney General of the United States and the Administrator of the United States Environmental Protection Agency.

*/s/ Will Thompson*
Will Thompson

# EXHIBIT A

DLA PIPER

**DLA Piper LLP (US)**
500 Eighth Street, NW
Washington, DC 20004
www.dlapiper.com

Meaghan C. Hembree
meaghan.hembree@us.dlapiper.com
T 202.799.4614
F 202.799.5614

August 14, 2026

***VIA PERSONAL SERVICE***

Channell Commercial Corporation
c/o Chris Watson, President
c/o Chris Lothschutz
c/o Kara Balderas
1700 Justin Road
Rockwall, Texas 75087

***VIA ELECTRONIC MAIL***

John Sullivan, Esq.
King & Spalding
2601 Olive Street, Suite 2200
Dallas, Texas 75201
JSullivan@kslaw.com

***WITH A COPY VIA REGISTERED MAIL, RETURN RECEIPT REQUESTED***

Lee Zeldin, Administrator
U.S. Environmental Protection Agency
Office of the Administrator
1200 Pennsylvania Avenue, NW
Washington, District of Columbia 20460

Scott Mason, Regional Administrator
U.S. Environmental Protection Agency
Region 6
1201 Elm Street, Suite 500
Dallas, Texas 75270

Kelly Keel, Executive Director
Texas Commission on Environmental Quality
P.O. Box 13087
Austin, Texas 78711

Todd Blanche
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, District of Columbia 20530

Channell Commercial Corporation
c/o CT Corporation System
1999 Bryan Street, Suite 900
Dallas, Texas 75201

Prysmian Cables and Systems USA, LLC
c/o CT Corporation System
1999 Bryan Street, Suite 900
Dallas, Texas 75201

**Re: Notice of Intent to File Citizen Suit Under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972**

To Whom It May Concern:

Pursuant to Section 7002(b) of the Resource Conservation and Recovery Act ("**RCRA**"), 42 U.S.C. § 6972(b), and 40 C.F.R. Part 254, Willcar Holdings LLC ("**Willcar**") provides formal notice ("**Notice**") of its intent to commence a citizen suit in the United States District Court for the Northern District of Texas against Channell Commercial Corporation ("**Channell**") under RCRA Sections 7002(a)(1)(A) and 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(A) and (a)(1)(B). The claims arise from Channell's past and ongoing hazardous waste violations at 1700 Justin Road, Rockwall,

Texas (the "**Property**"), which present or may present an imminent and substantial endangerment to health and the environment.

Willcar owns and leases the Property to Channell under a commercial lease dated January 1, 2017, as amended (the "**Lease**"). Channell operates a manufacturing facility on the Property. Channell is a subsidiary of Prysmian, a global cable and systems company headquartered in Milan, Italy. Prysmian Cables and Systems USA, LLC, Channell's parent entity, is copied on this Notice.

As alleged in this Notice, Channell is a registered large quantity generator ("**LQG**") of hazardous waste subject to extensive RCRA requirements relating to personnel training, emergency preparedness and response, hazardous waste determinations, and hazardous waste management. Notwithstanding these obligations, Channell has contributed, and continues to contribute, to the unpermitted and ongoing disposal of hazardous waste at the Property ("**Disposal**"), in violation of RCRA and presenting an imminent and substantial endangerment to health and the environment.

Channell's acts and/or omissions at the Property have resulted in violations of subtitle C of RCRA, 42 U.S.C. § 6921, et seq., and have caused the imminent and substantial endangerment alleged herein. Accordingly, Willcar may and intends to file suit immediately upon providing this Notice, without regard to the otherwise applicable 60-day or 90-day waiting periods. 42 U.S.C. §§ 6972(b)(1)(A), (b)(2)(A).[1]

## I. Channell's Unpermitted Disposal of Hazardous Waste

At approximately 6:45 p.m. on May 3, 2026, a gasket failure on a valve in Channell's resin storage system caused an unpermitted Disposal of hazardous waste at the Property. The Disposal resulted in at least 2,615 pounds of polyester resin (Reichhold Polylite 31720-00), containing at least 980 pounds of styrene, to escape into the environment. Reichhold Polylite 31720-00 is an ignitable hazardous waste (EPA Hazardous Waste No. D001).

The Disposal was not contained. Channell did not discover the Disposal until approximately ten hours after the gasket failure. During that time, hazardous waste flowed from the containment area across the loading dock, into a stormwater catch basin, through the storm pipe, and into the stormwater detention basin, which discharges to an intermittent stream flowing approximately 1.5 miles to Brush Creek.

The Disposal has not been addressed, and hazardous waste remains in the environment. On June 17, 2026, Channell's closed-circuit television inspection of the storm-drain pipe revealed exposed steel reinforcement approximately 3.2 feet downstream—a potential pathway to surrounding soil and groundwater—and cured resin containing hazardous waste approximately 268 feet downstream. The inspection was abandoned before reaching the outfall, leaving the downstream extent of the hazardous waste contamination uncharacterized.

Channell has not removed the hazardous waste identified within the catch basin, storm-drain pipe, box culvert, and related stormwater infrastructure. Accordingly, hazardous waste remains in place

---

[1] *See Glazer v. American Ecology Envtl. Servs. Corp.*, 894 F. Supp. 1029, 1039–41 (E.D. Tex. 1995).

at the Property and continues to serve as a source of contamination to soil, groundwater, surface water, and off-site areas. The violations described herein therefore are ongoing and are not limited to the initial May 3, 2026 Disposal event.

Sampling conducted from May through August 2026 by both Willcar and Channell confirmed that the Disposal has resulted in hazardous waste contamination exceeding TCEQ Tier 1 Action Levels both at the Property and at the off-site detention basin, as shown in the chart below.

| Date of Sample | Sample Location | Impacted Media | Contaminant | Concentration | Action Level |
|---|---|---|---|---|---|
| **May 14, 2026** | Containment area on Property where Disposal originated | Surface water | Styrene | 7.2 mg/L | 0.1 mg/L |
| **May 14, 2026** | Stormwater outfall at the off-site detention pond | Surface water | Styrene | 8.65 mg/L | 0.1 mg/L |
| **May 21, 2026** | Stormwater outfall at the off-site detention pond | Surface water | Styrene | 11.4 mg/L | 0.1 mg/L |
| **June 23, 2026** | Stormwater outfall at the off-site detention pond | Surface water | Styrene | 0.198 mg/L | 0.1 mg/L |
| **June 24, 2026** | TMW-9, immediately to the east of the storm grate on the Property | Groundwater | Ethylbenzene | 2.95 mg/L | 0.7 mg/L |
| **August 3, 2026** | French drainpipe connected to the storm grate on the Property, G-NB | Soil | Ethylbenzene | 19.7 mg/kg | 7.6 mg/kg |
| **August 3, 2026** | French drainpipe connected to the storm grate on the Property, G-NB | Soil | Styrene | 26.2 mg/kg | 3.3 mg/kg |

These results confirm that hazardous waste attributable to the Disposal remains present in multiple environmental media, including the surface water, soil, and groundwater, both on and off the Property. The continued detection of styrene and ethylbenzene above applicable TCEQ Action Levels demonstrates that the environmental impacts of the Disposal have not been contained, fully characterized, or remediated.

## II. Channell is in Violation of Subchapter III of RCRA

Channell generates, manages, and stores substantial quantities of hazardous waste at the Property and is registered with EPA and TCEQ as an LQG, making it subject to RCRA's generator regulations under 40 C.F.R. Part 262.

Based on the foregoing, Willcar alleges that Channell has violated the following RCRA requirements applicable to LQGs:

1) ***Unpermitted Disposal of Hazardous Waste.*** The catch basin, storm-drain pipe, and box culvert at the Property are functioning as unpermitted disposal units for D001 hazardous waste. Channell holds no permit authorizing disposal of hazardous waste at these locations. 40 C.F.R. Part 270. The hazardous waste has remained in these locations since the Disposal on May 3, 2026.

2) ***Failure to Make a Hazardous Waste Determination.*** Channell must determine whether each solid waste it generates or manages is a hazardous waste. 40 C.F.R. § 262.11. Channell has never made the required hazardous waste determination for the waste that remains lodged in the storm-drain system and in the environmental media contaminated as a result of the Disposal.

3) ***Failure to Monitor for Leaks, Pressure Buildup, Gas Generation, or Ruptures.*** After stopping operations in response to the Disposal, Channell was required to "monitor for leaks, pressure buildup, gas generation, or ruptures in valves, pipes, or other equipment, wherever this is appropriate." 40 C.F.R. § 262.265(f). Channell has failed to continue this required monitoring.

4) ***Failure to Treat, Store, or Dispose of Recovered Waste.*** Channell's emergency coordinator was required to "provide for treating, storing, or disposing of recovered waste, contaminated soil or surface water, or any other material that results from a release, fire, or explosion at the facility", and manage and newly generated waste accordingly. 40 C.F.R. § 262.265(g). Hazardous waste remains in the storm-drain pipe as a result of the Disposal, and Channell has failed to properly treat, store, or dispose of that waste.

5) ***Resuming Operations Before Completing Cleanup.*** The emergency coordinator must ensure that "[n]o hazardous waste that may be incompatible with the released material is treated, stored, or disposed of until cleanup procedures are completed" and that "[a]ll emergency equipment . . . is cleaned and fit for its intended use before operations are resumed." 40 C.F.R. § 262.265(h). Cleanup is not complete at the Property—hazardous waste remains in the pipe and the environment, and appropriate environmental investigations have not been completed to determine the extent of remediation required. Channell has nevertheless resumed normal operations.

## III. The Disposal May Present An Imminent and Substantial Endangerment to Health or the Environment.

Channell is a past and present generator of hazardous waste and operator of the Property, including as an LQG under 40 C.F.R. Part 262. Channell has contributed, and continues to contribute, to the Disposal of D001 hazardous waste within the meaning of 42 U.S.C. § 6903(3) and to the past or present handling, storage, treatment, transportation, or disposal of hazardous waste within the meaning of 42 U.S.C. § 6972(a)(1)(B), presenting an imminent and substantial endangerment to health or the environment.

Channell's contributions to this endangerment include, without limitation: operating the resin-storage system whose failure caused the Disposal; failing to contain the Disposal; failing to remove hazardous waste from the catch basin, storm-drain pipe, and box culvert; and failing to properly characterize, treat, store, or dispose of recovered waste, contaminated soil, surface water, and other material resulting from the Disposal.

The Disposal is ongoing, and, upon information and belief, hazardous waste remains within environmental media and stormwater infrastructure that continue to serve as migration pathways throughout the Property and to off-site locations. Channell has not completed an investigation sufficient to determine the nature and extent of ongoing hazardous waste contamination resulting from the Disposal. The June 17, 2026 inspection was abandoned before reaching the outfall, and migration pathways associated with the observed pipe deterioration remain uncharacterized. As a result, the full extent of affected soil, groundwater, and surface water remains unknown. Each day that passes without comprehensive remediation allows hazardous waste to spread further into soil, groundwater, and downstream waters. The threat to health and the environment is therefore imminent and substantial.

## IV. Relief to Be Sought

Willcar intends to seek, among other relief:

1) A mandatory injunction requiring Channell to perform a complete hazardous waste determination for all material remaining in the storm-drain system, catch basin, and box culvert; remove and properly dispose of all hazardous waste from those locations; repair or replace structural defects in the stormwater management system; resume required emergency monitoring and cleanup procedures; and conduct a comprehensive investigation of affected soil, groundwater, surface water, and stormwater infrastructure and, to the extent hazardous waste contamination exceeds applicable TCEQ Action Levels, remediate affected media to prevent further migration of hazardous waste;

2) A prohibitory injunction restraining further unpermitted disposal of hazardous waste and further deferral of remediation;

3) Declaratory relief; and

4) Costs of litigation, including reasonable attorney and expert witness fees.

Nothing in this Notice shall be construed as a waiver of Willcar's position that this action concerns violations of subtitle C of RCRA and is therefore not subject to the 90-day waiting period under 42 U.S.C. § 6972(b)(2)(A). Willcar reserves all rights, remedies, and defenses available under RCRA, CERCLA, and other applicable federal or state law, and in equity, including its right to amend or supplement the allegations in this Notice.

Please direct any questions regarding this notice to the undersigned.

Sincerely,
DLA Piper LLP (US)

*Meaghan Colligan Hembree*

Meaghan C. Hembree
Partner

Cc: Will Thompson, DLA Piper LLP (US)
Steven Autenrieth, DLA Piper LLP (US)
Amy O'Brien, DLA Piper LLP (US)
Jamie Ehrlich, DLA Piper LLP (US)
Willcar Holdings, LLC

[redacted]

EXTERNAL MESSAGE

[redacted]

**An important update below!**

**Special Delivery Process Serving Update:**

Order Number: 2250488

Served: 08/14/26 at 8:23 AM

**CHANNELL COMMERCIAL CORPORATIO Has Been Successfully Served.**

**Affidavit preparation or court filing will be done.**

**SERVICE REQUESTED BY:**

[redacted]
DLA PIPER US LLP
[redacted]

**PROCESS SERVICE RECIPIENT:**

CHANNELL COMMERCIAL CORPORATION By delivering to Authorized Person, Kara Baldera
1700 JUSTIN ROAD
ROCKWALL, TX 75087

**ADDITIONAL INFORMATION:**

Order Placed: 08/13/26 at 6:16 PM
Type: *****Immediate Process Serving*****

[redacted]

**Special Delivery (214) 866-3270** **app.specialdelivery.com**